[Cite as *Reed v. Reed*, 2023-Ohio-756.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# HARDIN COUNTY

KATHY B. REED,

    PLAINTIFF-APPELLEE/
    CROSS-APPELLANT,           CASE NO. 6-22-03

    v.

DOUGLAS R. REED,

                            **O P I N I O N**

    DEFENDANT-APPELLANT/
    CROSS-APPELLEE.

Appeal from Hardin County Common Pleas Court
Domestic Relations Division

Trial Court No. DRB 2020 3080

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: March 13, 2023

APPEARANCES:

    *Paul Giorgianni* for Appellant/Cross-Appellee

    *Tim Steinhelfer and Sheila E Minnich* for Appellee/Cross-Appellant

**WALDICK, J.**

{¶1} Husband-appellant-cross appellee, Douglas R. Reed ("Douglas"), and wife-appellee-cross appellant, Kathy B. Reed ("Kathy"), both appeal the Hardin County Common Pleas Court, Domestic Relation Division's February 28, 2022 decree of divorce dividing the parties' assets and ordering Douglas to pay Kathy spousal support. On appeal, Douglas challenges, *inter alia*, the trial court's determinations that he engaged in financial misconduct, and the trial court's award of spousal support to Kathy. In her appeal, Kathy also challenges the trial court's award of spousal support, arguing that it was too low, and she challenges other divisions of marital assets by the trial court. For the reasons that follow, the trial court's judgment is affirmed in part, and reversed in part.

*Background*

{¶2} Douglas and Kathy were married in November of 2003. They had no children together. During the parties' marriage, they acquired a substantial amount of assets including multiple residences and numerous parcels of farmland.

{¶3} Kathy had a lucrative career selling natural gas, which she retired from in 2013. However, in 2018 Kathy took a job at Edward Jones so that the parties could have health insurance when Douglas's employment no longer provided it. Meanwhile, Douglas managed the parties' significant farming operation, and he was

also the owner/operator of Silver Creek Supply. Additionally, the parties earned income from wind turbines on their property and from cash-renting farmland.

**{¶4}** In 2020, both parties filed for divorce. Temporary orders were instituted, which ordered Douglas to pay Kathy temporary spousal support of $8,500 per month. Although the parties were able to agree on the division of many of their assets, the matter proceeded to a final hearing on the division of their remaining assets and on the issue of spousal support. The final hearing was held over four days: August 11-12, 2021, October 7, 2021, and November 5, 2021.

**{¶5}** On February 28, 2022, the trial court filed a lengthy judgment entry discussing the numerous stipulations and agreements of the parties, then analyzing the remaining pending issues. As relevant to this appeal, the trial court determined that Douglas had engaged in financial misconduct during the pendency of the divorce. As a result of Douglas's financial misconduct, the trial court awarded Kathy additional compensation from Douglas's distribution of the parties' assets. The trial court also awarded Kathy $4,000 in spousal support per month.

**{¶6}** Both parties appealed the trial court's judgment. Douglas asserts the following assignments of error for our review.

### Douglas's First Assignment of Error
**The court erred by finding that Doug committed financial misconduct related to stored grain and by imposing a $283,100 financial misconduct award against Doug.**

**Douglas's Second Assignment of Error**
**The trial court erred by finding that Doug's failure to make estimated federal income-tax payments constituted financial misconduct, and by imposing a $34,752 financial-misconduct award against Douglas.**

**Douglas's Third Assignment of Error**
**The court erred by making the termination date of Doug's obligation to pay permanent spousal support contingent upon exercise of appellate rights, the uncertainty of the real estate market, and Kathy's whim.**

**Douglas's Fourth Assignment of Error**
**The court erred in determining the amount of permanent spousal support.**

**Douglas's Fifth Assignment of Error**
**The court erred to the extent the court ordered Doug alone to bear the carrying costs of the real estate that the court ordered the Reeds to sell.**

**Douglas's Sixth Assignment of Error**
**The court erred by failing to characterize as a distribution of property to Kathy $10,000 for a forensic accounting expert even though Kathy never retained or paid a forensic accounting expert.**

{¶7} Kathy's appeal from the trial court's judgment asserts the following assignments of error for our review.

**Kathy's First Assignment of Error**
**The trial court erred by ordering an equal division [of] marital assets Douglas willfully failed to disclose.**

**Kathy's Second Assignment of Error**
**The trial court abused its discretion with regard to 2020 taxes by finding that a stipulation for equal division existed.**

**Kathy's Third Assignment of Error**

**The trial court abused its discretion in the amount of periodic spousal support by fashioning the award too low.**

**{¶8}** Where the parties' assignments of error are related, we will address them together.

*Douglas's First Assignment of Error*

**{¶9}** In Douglas's first assignment of error, he argues that the trial court erred by finding that he committed financial misconduct related to the sale of grain harvested in 2020. Further, he argues that the trial court erred by imposing a $283,100 financial-misconduct award against him for his dissipation of the martial grain.

Standard of Review

**{¶10}** The burden of proving financial misconduct rests with the complaining spouse. *Davis v. Davis*, 11th Dist. Geauga No. 2011-G-3018, 2013-Ohio-211, ¶ 104. The term "financial misconduct" includes "the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets[.]" R.C. 3105.171(E)(4). " 'Financial misconduct implies some type of wrongdoing which results in the offending spouse either profiting from the misconduct or intentionally defeating the other spouse's distribution of marital assets.' " (Citations omitted.) *Cianfaglione v. Cianfaglione*, 11th Dist. Lake No. 2017-L-134, 2019-Ohio-71, ¶ 51, quoting *Chattree v. Chattree*, 8th Dist. Cuyahoga No. 99337, 2014-Ohio-489, ¶ 18.

**{¶11}** A trial court's finding that financial misconduct has been committed is reviewed under the manifest weight of the evidence standard. *Guagenti v. Guagenti*, 3d Dist. Allen No. 1-16-47, 2017-Ohio-2706, ¶ 84. On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

**{¶12}** In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley* at ¶ 21. This presumption arises because the trial court is in the best position "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Id.* at 81.

**{¶13}** In the event that the trial court finds that financial misconduct was committed, we will "not reverse an award to compensate for financial misconduct absent an abuse of discretion." *Guagenti* at ¶ 84 . Under the abuse of discretion standard, an appellate court is not to substitute its judgment for the trial court's judgment. *Schroeder v. Niese*, 3d Dist. Putnam No. 12-16-05, 2016-Ohio-8397, ¶ 7. Thus, a mere error of judgment does not rise to the level of an abuse of discretion. *Siferd v. Siferd*, 3d Dist. Hancock No. 5-17-04, 2017-Ohio-8624, ¶ 16. "[T]o constitute an abuse of discretion, the trial court's decision must be unreasonable, arbitrary, or capricious." *Southern v. Scheu*, 3d Dist. Shelby No. 17-17-16, 2018-Ohio-1440, ¶ 10.

<p align="center">Controlling Statute</p>

**{¶14}** Financial misconduct in a divorce proceeding is governed by R.C. 3105.171(E)(4) and (E)(5), which read as follows:

> **(4) If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.**

> **(5) If a spouse has substantially and willfully failed to disclose marital property, separate property, or other assets, debts, income, or expenses as required under division (E)(3) of this section, the court may compensate the offended spouse with a distributive award or with a greater award of marital property not to exceed three times the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse.**

Analysis

**{¶15}** In determining that Douglas engaged in financial misconduct with regard to dissipating stored grain from the 2020 harvest, the trial court conducted the following analysis:

**FINANCIAL MISCONDUCT/DISTRIBUTIVE SHARE**

**\* \* \***

**From the evidence herein it is clear that Husband was in total control of the farming operations. As such, the evidence supports that the parties *always* had stored grain carried over from year to year. [Trial court lists the values of stored grain for the years 2010 – 2019, which range from a low of $87,000 in 2017 to a high of $929,000 in 2011.] \* \* \***

**Average per year for ten years: $566,200.00 per year.**

**Average per year for the most recent five years: $450,800.00**

**No credible explanation was given concerning why, after a long history of yearly *significant amounts* of stored grain, during farming years that appeared to be normally lucrative (gross receipts in 2019 of $2,857,648.00, and in 2020 of $1,539,059.00) there should be absolutely no stored grain at this time. The Court can only draw the conclusion that Husband has acted in a manner as to dissipate, destroy, conceal, fail to disclose, or fraudulently dispose of grain which should be in existence.**

**Additionally, as previously stated, after separation of the parties Husband failed to make estimated payments for income taxes to the tune of an average of $69,504.25 per year.**

**Using the ten-year average of stored grain of $566,200.00 plus the average of $69,504.25 estimated taxes that should have**

> **normally been paid, it appears that Husband has converted a total of $635,704.25 to his own use.**
>
> **Husband may claim that he was paying Wife $8,500.00 per month ($102,000.00 per year) per the temporary order #2 * * * but a yearly payment of $102,000.00 is far less than $635,704.25.**
>
> **Therefore, the Court therefore** [sic] **specifically finds that Husband has engaged in financial misconduct, and substantially and willfully failed to disclose marital property in the minimum sum of $566,200, being the average stored grain from 2010 to 2019, and in failing to pay estimated payments for income tax in the amount of $69,504.25.**

(Emphasis sic.) (Doc. No. 103).

**{¶16}** Douglas argues that the trial court's determination regarding financial misconduct was against the manifest weight of the evidence for numerous reasons. First, he argues that the only evidence in the record indicates that there was no stored grain from 2020 at the time of the final hearing because he had sold all the grain from the 2020 harvest in December of 2020 and January of 2021. Second, Douglas argues that there was no evidence that he willfully failed to disclose the sale of any of the 2020 grain, particularly given that the money he received was used, at least in part, to pay Kathy's spousal support and to pay the mortgages on the farms. In addition, Douglas argues that any sales of grain were shown on his financial ledger, which was provided in discovery.

**{¶17}** In reviewing Douglas's arguments, we emphasize that it was the established practice of the parties to carry-over significant amounts of stored grain

each year from their harvest in order to sell the grain at a higher price. The trial court entered temporary orders while the divorce was pending for the parties to continue to act according to prior custom.[1] Rather than store some, or any, of the grain from the 2020 harvest to sell later at a higher price, Douglas *unilaterally* decided to sell *all* the grain from 2020 in December of 2020 and January of 2021, keeping no stored grain.[2] By selling the grain early, Douglas admitted that he effectively devalued it. At the May 6, 2021, pretrial hearing Douglas testified: "Normally I would have carried that grain, I would have had it all right now. And to be honest, if I had that grain right now, we would have got twice as much money out of it." (May 6, 2021, Tr. at 31).

{¶18} A ledger of Douglas's financial transactions was introduced into evidence at trial, illustrating Douglas's grain sales from the 2020 harvest. (Pl.'s Ex. 69). In December of 2020, Douglas's financial account showed "Grain deposit[s]" of $76,591.69, $93,870.12, $37,026.24, $116,163.99, $47,694.61, $85,818.01, and $103,107.59. In early January of 2021, when Douglas indicated he sold the last of the grain from the 2020 harvest, Douglas's account showed deposits that had no description for $47,981.16, $16,638.44, $153,359.38, and $54,428.38.

---

[1] At the first temporary orders hearing, the trial court stated, "You should continue to do your business in the manner that you've done your business in the recent past." (Oct. 8, 2020, Tr. at 44).

[2] As Doug suggests in his argument, the only evidence in the record *did* indicate that all stored grain had been sold by January of 2021 at the latest. Kathy may have speculated that there was additional stored grain somewhere but we have no actual evidence to support this claim.

{¶19} Douglas thus sold all the 2020 grain, including some amount that the parties normally would have stored, without consulting Kathy, and without any order by the trial court. Douglas claims that he decided to unilaterally sell the 2020 grain that he normally would have stored in order to pay mortgages and to pay his court-ordered spousal support. However, some of the parties' marital assets were sold during the pendency of the divorce by agreement and by order of the trial court such as grain bins and a pole barn in order to pay the parties' obligations. Moreover, even if Doug needed to sell some of the stored grain, there is no indication that Douglas had to determine to unilaterally sell *all* of the grain he normally would have stored early.

{¶20} Furthermore, it is not clear what money received from the 2020 grain went to pay for marital debt. For example, Douglas's ledger shows that he was also paying significant amounts of money to Silver Creek for "bills," which was his wholly owned corporation that he took separately in the divorce.[3] In addition, Douglas paid his attorney's fees from this case and a prior unrelated case out of the account where the grain deposits were present.[4]

---

[3] The ledger entries for "bills" to Silver Creek are separate and distinct entries in the ledger from payments on "Silver Creek Debt."

[4] In a journal entry the trial court filed May 7, 2021, the trial court stated:

> **It is undisputed that since the filing of this action Defendant-Husband has received and transferred large sums of money, hundreds of thousands of dollars going to the Silver Creek business of which he is the sole owner; approximately $30,000.00 in legal fees for this case and other legal matters; $10,000.00 paid to a forensic accountant; as well as *pre-paying* his mortgage expense until the month of trial. Husband has approximately $30,000.00 in cash deposits, and has sold all the stored grain.**

(Doc. No. 72).

-11-

**{¶21}** After reviewing the record, and Douglas's claims related to the lack of stored grain for 2020, the trial court determined that "no credible explanation was given" as to why Douglas had no stored grain at the time of the final hearing. (Doc. No. 103). Stated differently, the trial court did not find Douglas credible in his contention that he had no choice but to unilaterally decide to sell all his stored grain from the 2020 harvest earlier than prior customs would dictate. The trial court determined that it could only draw the conclusion that Douglas had acted in a manner as to "dissipate, destroy, conceal * * * or fraudulently dispose of grain which should be in existence." (*Id.*) As Douglas, by his own admission, sold the grain at a lower price than he could have, in contravention of his custom, we do not find that the trial court clearly lost its way by finding that he committed financial misconduct. *See Smith v. Smith*, 9th Dist. Summit No. 26013, 2012-Ohio-1716, ¶ 21 (affirming finding of financial misconduct wherein, *inter alia*, husband "made critical and unilateral decisions concerning the parties' retirement funds and other assets").

**{¶22}** With this decided, we must determine whether the trial court abused its discretion by compensating Kathy for Douglas's financial misconduct. Douglas's sale of the 2020 grain contrary to his prior practice of storing it made it difficult for the trial court to determine how much value Douglas had effectively dissipated. As a result, the trial court used the averages of the prior 10 years of stored grain to determine an amount that seemed appropriate. We do not find that the trial court's

use of averages from prior years was an abuse of discretion where the prior years of stored grain were meticulously calculated and acknowledged by Douglas as accurate.[5] For all of these reasons, Douglas's first assignment of error is overruled.

*Douglas's Second Assignment of Error*

**{¶23}** In Douglas's second assignment of error, he argues that the trial court erred by determining that his failure to make estimated federal income-tax payments constituted financial misconduct. In addition, Douglas argues that even if he did commit financial misconduct for failing to pay "estimated taxes" ahead of time, the taxes were ultimately paid, thus the only actual "damages" from any misconduct were the late penalties from the IRS, not the amount of estimated taxes.

Analysis[6]

**{¶24}** After a hearing on temporary orders in this case wherein the parties' tax liabilities for 2020 were discussed, the trial court issued the following order:

> **10) Each party shall deposit with the Internal Revenue Service the appropriate amount of quarterly estimated taxes based on income received or controlled by that party.**

(Doc. No. 53).

**{¶25}** Pursuant to the trial court's temporary order, and because the evidence established that Douglas was "in total control" of the farming operation, Douglas

---

[5] In fact, the trial court's average amount is significantly less than taking the amounts received from grain sales in December of 2020 and the unattributed deposits from January of 2021 and multiplying them by 2 (because Doug testified if he held on to the grain he could have received twice as much for it).
[6] The same standard of review applied in the first assignment of error applies here as well.

should have paid quarterly estimated taxes in this case. However, Douglas failed to comply with the trial court's order despite the fact that the parties' established practice was to make significant estimated income tax payments in the years preceding their separation. Based on these actions, the trial court found that

> **No evidence was adduced concerning why Husband failed to pay the normal amount of estimated taxes on farm income in [2019 and 2020]. Failure to do so resulted in more taxes being due at the time of ultimate filing.**
>
> **Radical changes in established financial practices after separation of the parties are always of interest and concern to the Court in any divorce.**

(Doc. No. 103).

{¶26} The trial court determined that Douglas failed to pay estimated taxes of $69,504.25 in contravention of its prior order and in contravention of the parties' established practice. Thus the trial court determined that Douglas engaged in financial misconduct, awarding Kathy $34,752.13 (one-half of the amount of estimated taxes Douglas failed to prepay).

{¶27} Douglas now argues that the trial court's determination was against the manifest weight of the evidence. He contends that failing to make estimated tax payments did not constitute financial misconduct; he contends that failing to comply with the temporary order cannot form the basis of an award because the order was filed in January of 2021 but Douglas was being held accountable for estimated taxes he did not pay in 2019 and 2020; he contends that Kathy also failed to make

-14-

estimated tax payments in 2019 and 2020; and he contends that the amount of the award is contrary to law given that the taxes were actually paid.

{¶28} In reviewing Douglas's arguments, we emphasize that his decision not to pay estimated taxes was completely against the parties' established practice. It was also in contravention of the trial court's temporary orders. For these reasons alone we find that the trial court's financial misconduct finding was supported by the record.

{¶29} However, we emphasize that while Douglas did not pay estimated taxes in advance as ordered, the taxes were ultimately paid-in-full. As a result of Douglas's failure to pay estimated taxes, the parties were assessed penalties, according to the record, of just over $1,000. Despite the parties' only being penalized just over $1,000 for Douglas's failure to pay estimated taxes in advance, the trial court awarded Kathy $34,752.13—one half of the estimated taxes that Douglas did not pay early. Though, again, the taxes were ultimately paid here.

{¶30} The trial court could have properly compensated Kathy for Douglas's failure to pay estimated taxes, but ordering him to pay her roughly 30 times the amount is punitive in nature. In *Eggeman v. Eggeman*, 3d Dist. Auglaize No. 2-04-06, 2004-Ohio-6050, we reversed the amount of an award of financial misconduct where the award was not directly commensurate with a financial loss, but rather punitive in nature. We held, "the purpose of R.C. 3105.171(E)(3) is to neutralize

losses caused by the offending spouse's conduct and not to simply reward one spouse for the other's wrongdoing when no loss in value has occurred." *Eggeman* at ¶ 26.

**{¶31}** Here, compensating Kathy with over $34,000 when her losses were, at most, just over $1,000 (or half of this amount), is punitive in nature and not reflective of the loss in value of marital funds. *See Walker v. Walker*, 3d Dist. Marion No. 9-12-15, 2013-Ohio-1496 (reversing the amount of a financial misconduct award for being too speculative and inequitable). Thus based on the record before us, we find that the amount awarded by the trial court for Douglas's failure to pay estimated taxes that were ultimately paid was unreasonable. Accordingly, Douglas's second assignment of error is sustained.

### *Douglas's Third Assignment of Error*

**{¶32}** In Douglas's third assignment of error, he argues that the trial court erred by ordering him to pay Kathy $4,000 in monthly spousal support for an indefinite period until the parties' real estate was sold.

### Standard of Review

**{¶33}** Trial courts have broad discretion concerning an award of spousal support. *Schwieterman v. Schwieterman*, 3d Dist. Logan No. 8-19-49, 2020-Ohio-4881, ¶ 69. Therefore, a trial court's decision related to spousal support will not be reversed absent an abuse of discretion.

Analysis

**{¶34}** With regard to spousal support in this case, the trial court ordered Douglas to pay Kathy $4,000 per month, but only "until all properties are sold, all debts are paid and refinanced as ordered herein, and all distribution made according to the terms of this order." (Doc. No. 103). The trial court then provided detailed orders regarding the properties and their distribution as follows:

> **2) Wife shall quit claim her interest in the properties described in attached Exhibit B and C to Husband within 30 days of the expiration of the appeal periods to this order, upon the condition that within the same period Husband shall remove Wife's liability on the mortgages thereon to Liberty National Bank, and save Wife harmless therefrom.**
>
> **3) Husband shall quit claim his interest in the property described in attached Exhibit D to Wife within 30 days of the expiration of all appeal periods to this order, upon the condition that within the same period Wife shall remove Husband's liability on the mortgage thereon to Liberty National Bank, and save Husband harmless therefrom.**
>
> **4) All remaining real estate (Assets 4, 5, 6, and 7) shall be sold at public sale upon the following terms, and from the proceeds of sale shall be paid the mortgages or land contracts thereon (Debuts D, E and F) and all expenses of sale and costs of closing. The remaining proceeds shall immediately upon sale be escrowed equally (50-50) with each attorney of record.**
>
> **Note: Each tract of land shall be sold or transferred subject to all wind turbines contracts for equipment on said tract.**
>
> **The terms of sale shall be as follows:**
>
> a) **The parties shall jointly attempt to sell each property at private sale for a period of 90 days after the expiration of all**

> **appeal periods for this journal entry, for any amount mutually agreeable to each party.**
>
> b) **Should any tract fail to sell during said period of 90 days, then the said property or properties shall be sold at public auction to the highest bidder, equaling or exceeding the value listed in the Balance Sheet, upon the condition that no family member within the fourth degree of consanguinity or affinity shall be permitted to bid on or purchase any said property. The parties shall employ Devin Dye, of Lima, Ohio, to advertise and conduct said sale according to best practices to obtain the highest price[.]**
>
> *The parties may, however, mutually agree to another auctioneer/broker or other terms of sale, but only as set forth in writing signed by each party. Additionally, upon written waiver of appeal by both parties, the parties may then immediately proceed pursuant to the terms set forth herein.*
>
> **Until sold the parties shall proceed to farm said real estate according to their prior practice. Mutually agreed costs of farming shall be paid from the escrow account held herein until sale of the properties. All net profits of the farming operation shall be equally divided between the parties, subject to further orders herein.**

(Emphasis sic.)[7] (Doc. No. 103).

{¶35} Douglas now takes issue with the indefinite duration of the trial court's spousal support order, arguing, *inter alia*, that the order gives Kathy the power to prolong her spousal support by being obstinate and not agreeing to a sale price for the real estate, or by pursuing an appeal. He also argues that the trial court's decree

---

[7] The section italicized by this Court was bold in the trial court's judgment entry.

is ambiguous as to what the "appeal periods" mean. Further, Douglas argues that the decree effectively forces him to farm against his will.

**{¶36}** In reviewing the trial court's spousal support order, we emphasize that there is nothing unlawful about the indefinite award that is set to end after an express event. *See Houck v. Houck*, 11th Dist. Trumbull No. 97-T-0025, 1997 WL 800923. Here, spousal support was only awarded to Kathy until the properties in this case are sold, at which point she will have enough liquid assets to support herself in the future. We see nothing arbitrary about the trial court's decision here.

**{¶37}** Moreover, contrary to Douglas's argument, there is nothing ambiguous about "appeal periods" in the trial court's entry given that App.R. 4 contains the dates to file an appeal as of right and S.Ct.Prac.R. 7.01(A) contains the timeline for filing a jurisdictional appeal.

**{¶38}** Finally, we note that Douglas's argument that the trial court's entry forces him to farm against his will is simply inaccurate. Although the trial court ordered the parties to continue to act as they had previously until the property is sold, Douglas's testimony at the final hearing was that he had largely given up farming and had been allowing his son to farm his land through cash-rent. Thus this is the most recent practice.

**{¶39}** In sum, we find nothing arbitrary or unreasonable about the trial court's award of spousal support until all real estate is sold. The trial court set forth

numerous contingencies for the parties and there is nothing unlawful about the trial court's order. Therefore, Douglas's third assignment of error is overruled.

*Douglas's Fourth Assignment of Error*;
*Kathy's Third Assignment of Error*

**{¶40}** In Douglas's fourth assignment of error he argues that the trial court erred by awarding Kathy the amount of $4,000 per month in spousal support. In Kathy's third assignment of error, she argues that the trial court erred by awarding a spousal support amount that was too low.

Relevant Authority[8]

**{¶41}** Revised Code 3105.18 governs the award of spousal support in divorce cases. " '[S]pousal support' means any payment or payments to be made to a spouse or former spouse, or to a third party for the benefit of a spouse or a former spouse, that is both for sustenance and for support of the spouse or former spouse." R.C. 3105.18(A). "In divorce * * * proceedings, upon the request of either party and after the court determines the division or disbursement of property * * *, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(B).

---

[8] The same standard of review applied in the third assignment of error is applicable here.

{¶42} Importantly, an award of spousal support is not based solely on the need of a party. *Schwieterman* at 69. An award of spousal support must be balanced against the obligor's ability to pay. *Id.*

{¶43} In order to determine whether spousal support is appropriate and reasonable, R.C. 3105.18(C)(1) provides a list of factors that a trial court must consider. These factors read as follows:

> **(a)  The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;**
>
> **(b)  The relative earning abilities of the parties;**
>
> **(c)  The ages and the physical, mental, and emotional conditions of the parties;**
>
> **(d)  The retirement benefits of the parties;**
>
> **(e)  The duration of the marriage;**
>
> **(f)  The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;**
>
> **(g)  The standard of living of the parties established during the marriage;**
>
> **(h)  The relative extent of education of the parties;**
>
> **(i)  The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;**
>
> **(j)  The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to,**

**any party's contribution to the acquisition of a professional degree of the other party;**

**(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;**

**(l) The tax consequences, for each party, of an award of spousal support;**

**(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;**

**(n) Any other factor that the court expressly finds to be relevant and equitable.**

Analysis

**{¶44}** In this case, the trial court explicitly analyzed all of the factors in R.C. 3105.18(C)(1) and determined that Douglas should pay Kathy $4,000 per month until all the parties' properties that had been ordered to be sold in the final divorce decree were sold, all debts were paid or refinanced as ordered, and all distributions had been made according to the trial court's final order.

**{¶45}** Douglas contends that the trial court should not have awarded spousal support at all because Kathy would ultimately be receiving over $3 million in assets in the property division. At the very least, Douglas argues that the spousal support award was too high. By contrast, Kathy argues that the award was too low given, *inter alia*, Douglas's earning potential.

{¶46} In our own review of the matter, we emphasize that the trial court's judgment entry addressed each and every factor of R.C. 3105.171(C)(1).[9] The trial court considered the income of the parties, their earning abilities, their age and health, their retirement benefits, the duration of the marriage, their standard of living, the education of the parties, and the assets and liabilities being distributed.

{¶47} The parties' claims to individual erroneous statements in the trial court's analysis are either inaccurate or do nothing to undermine the trial court's analysis in its entirety. For example, Douglas argues that the trial court improperly determined that he was receiving "income producing properties," but he ignores the fact that he was receiving Silver Creek in the distribution.[10] For Kathy's part, she ignores the *significant* assets that she was receiving in the division of property, and the *significant* amount of money she would receive once the parties' properties were sold.

{¶48} The trial court fashioned a spousal support award that took into account the parties' "upper-middle class lifestyle" and determined that Douglas, the primary earner for the prior decade of the relationship, should pay Kathy $4,000 per month essentially until she had the money from the sale of the parties' assets. When

---

[9] Some of the factors were found to be inapplicable to the parties.

[10] Douglas also argues that the trial court erred by determining that Douglas should only spend $25 per month on life insurance when he had made significant investments prior to, and during the marriage, in life insurance. While the trial court did discuss Douglas's life insurance expenditures in its entry, it was not specifically mentioned in the trial court's spousal support analysis. Moreover, we emphasize that the trial court analyzed each parties' expenditures and reduced some of them or equalized them.

-23-

reviewing the record as a whole, we cannot find that the trial court abused its discretion. *See Brown v. Brown*, 8th Dist. Cuyahoga No. 100499, 2014-Ohio-2402, ¶ 39 (holding the trial court's consideration of all the factors in R.C. 3105.18(C)(1) supported spousal support award). Therefore, Douglas's fourth assignment of error and Kathy's third assignment of error are overruled.

*Douglas's Fifth Assignment of Error*

**{¶49}** In Douglas's fifth assignment of error, he argues that the trial court erred by ordering "Doug alone to bear the carrying costs of the real estate that the court ordered the Reeds to sell." (Appt.'s Br. at 23). Despite this statement in his brief, Douglas then readily acknowledges that "[n]othing in the Decree suggests that Doug alone bears the post-decree carrying costs." (Appt.'s Br. at 23). These contradictory statements alone are enough to defeat his assignment of error.

**{¶50}** Nevertheless, we emphasize that Douglas's assignment of error is simply not reflective of the record. The trial court indicated that mutually agreed costs of farming shall be paid from the escrow account and the net profits should be divided equally between the parties. Thus the farming costs, including, presumably, mortgages and property taxes, were covered by the trial court. The equity in those farms will be divided equally once the properties are sold, so we see no error here. Therefore, Douglas's fifth assignment of error is overruled.

*Douglas's Sixth Assignment of Error*

**{¶51}** In Douglas's sixth assignment of error, he argues that the trial court erred by failing to make a distributive award to Douglas in the amount of $5,000, one-half of the amount Kathy received during the pendency of the case to retain a forensic accountant.

Analysis

**{¶52}** Douglas's sixth assignment of error is entirely undermined by a stipulation the parties entered into on the first day of the final hearing. The parties stipulated that, "[H]usband is not going to be reimbursed for any money that he has given to the wife. You had ordered him to pay 12,500 in attorney fees. He's not getting reimbursed for that. And you ordered him to pay 10,000 on the accountant fees. Everybody's paying their own, and he's not getting reimbursed." (Tr. at 104-105).

**{¶53}** As Douglas entered into an agreement regarding the accountant fees and that agreement was presented to the trial court without objection, we can find no error here. *See Bispeck v. Battin Insurance Agency, Inc*. 11th Dist. Trumbull No. 3453, 1985 WL 10189 (holding that oral stipulations are binding if understood by the parties and relied upon.) Therefore, Douglas's sixth assignment of error is overruled.

*Kathy's First Assignment of Error*

**{¶54}** In Kathy's first assignment of error, she argues that the trial court erred by ordering an equal division of the marital assets, including those Douglas willfully failed to disclose.

Analysis

**{¶55}** Contrary to Kathy's argument, Douglas was ordered to compensate Kathy for his financial misconduct. Pursuant to R.C. 3105.171(E), the trial court could have awarded Kathy a greater distributive share of the marital assets, and the trial court did, in fact, order Douglas to pay Kathy from his share of the division as a result of his financial misconduct. Thus Kathy's argument is an inaccurate characterization of the record. Here, the trial court's determination to compensate Kathy was entirely discretionary, and there was nothing arbitrary or unreasonable. Therefore, Kathy's first assignment of error is overruled.

*Kathy's Second Assignment of Error*

**{¶56}** In Kathy's second assignment of error, she argues that the trial court abused its discretion regarding the 2020 taxes by finding that a "stipulation" for equal division existed.

Analysis

**{¶57}** Kathy's second assignment of error claims that the trial court erred by finding that a "stipulation" for an equal division of the 2020 taxes existed. However,

she does not cite to the record where the trial court found such a stipulation. Her failure to cite to the record is in contravention of App.R. 16(A)(3). Moreover, as the cross-appellee states, the record does not reflect that such a stipulation exists. Rather, the record reflects that the parties' 2020 taxes were paid out of their escrow account, effectively dividing the tax burden, which would be an equitable result. We can find no error in the record here. Therefore, Kathy's second assignment of error is overruled.

*Conclusion*

{¶58} For the foregoing reasons Douglas's first, third, fourth, fifth, and sixth assignments of error are overruled, and his second assignment of error is sustained. Kathy's assignments of error are all overruled. Therefore, the judgment of the Hardin County Common Pleas Court is affirmed in part, reversed in part, and this cause is remanded for the trial court to determine the proper award for Douglas's financial misconduct in failing to prepay the parties' taxes as ordered.

*__Judgment Affirmed in Part,__*
*__Reversed in Part and__*
*__Cause Remanded__*

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**/jlr**