[Cite as *Gilleo v. Gilleo*, 2010-Ohio-5191.]


IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MERCER COUNTY


WILLIS GILLEO,

    PLAINTIFF-APPELLANT,              CASE NO.  10-10-07

    v.

BEVERLY GILLEO,                    O P I N I O N

    DEFENDANT-APPELLEE.


Appeal from Mercer County Common Pleas Court
Domestic Relations Division
Trial Court No. 07 DIV 075

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   October 25, 2010


APPEARANCES:

    *Kelly J. Rauch*  for Appellant

    *Thomas E. Luth*  for Appellee

**SHAW, J.,**

{¶1} Plaintiff-Appellant, Willis Gilleo ("Willis") appeals the judgment of the Mercer County Court of Common Pleas, Domestic Relations Division, granting a divorce from Defendant-Appellee, Beverly Gilleo ("Beverly"). On appeal, Willis contends that the trial court made several errors in dividing marital property, separate property, and debts.

{¶2} The facts relevant to this appeal are as follows. Willis and Beverly married on March 8, 2003, in Celina, Ohio. They separated on January 16, 2006, and were granted a divorce on April 14, 2009. No children were born as issue of the marriage.

{¶3} The parties had been living together since September of 2000. Beverly owned a home and property located at 205 Stella Street that she had purchased in 1985. Originally, the couple lived elsewhere because the Stella Street property had been badly damaged by renters. Beverly testified that the home was in "fair" condition and she was planning to repair it. She had already purchased new windows and drywall to restore the home. Willis testified that the home was "uninhabitable" with drywall and insulation torn out, windows broken out, and a flooded basement. Therefore, he wanted to tear it down and build a brand new home in its place on Beverly's property.

{¶4} Willis had construction experience, having previously owned a construction company and had worked as an electrical engineer and a mechanical engineer. At that time, he was earning over $65,000, plus bonuses,[1] and had approximately $50,000 funding available from the sale of his previous home. Beverly claimed that she did not want to tear down the old house and that she told Willis she could not afford to build a new home. She earned approximately $20,000 working at Wal-Mart and for the *Dayton Daily News*. She claims that she agreed to have Willis demolish the old house and build a new one because Willis said he would help her if the payments got too high.

{¶5} In June 2001, they tore down the old house and began constructing a new home that Willis designed. Willis acted as general contractor and worked on the home, along with various other contractors. Beverly's adult son, Charles Dennis, and Willis' adult son, Adam Gilleo, also helped with the demolition and the new construction. Both sons appeared at the hearing and provided testimony as to how much time and work each contributed. Charles testified that he worked on the home even after he began working at Celina Aluminum Precision Technology, aka CAPT, on November 5, 2001, and that his contributions to the home construction compared to Adam's was 60/40 or 65/35, with him performing more work on the home than Adam. Willis also testified about the work of both

---

[1] At the time of the hearing, Willis testified that he was currently receiving only $1,750 per month in disability payments. He testified that he is disabled and has not been able to work since August 2005.

sons, stating that each equally participated in the demolition of the old home but that Charles did little for the new home construction because he had obtained a job by that point and worked several hours.

{¶6} The construction was completed in early 2002, and the couple moved into the new home together, along with Charles, who also had lived with the couple in their previous residence. In March 2003, Beverly and Willis married. They continued to reside together in the Stella Street home until January 16, 2006, when Willis moved out after a dispute with Beverly's son. Willis filed for divorce in December 2007.

{¶7} On July 28, 2008, Willis and Beverly appeared before the magistrate for a hearing, and both parties testified and presented numerous exhibits for the court's review. They testified concerning several vehicles and the debts associated with those vehicles. The parties also testified concerning who was entitled to various household items, including a grandfather clock, a coffee pot, curtains, a pressure washer, suitcases, a freezer, a ladder, and a wheelbarrow. However, the primary area of contention involved the Stella Street home and property.

{¶8} Willis testified that he had spent his own money to build the home and presented almost two hundred exhibits showing receipts, invoices, checks, and credit card payments for various expenses allegedly incurred in the building of the new home. He testified that he spent $113,940.54 between June 2001 and

November 2002, and showed deposits of over $73,000 towards the construction of the home that he asserted came from his personal monies.

{¶9} During cross-examination, issues were raised concerning whether all of the invoices had actually been paid and whether there was a duplicate billing for a range hood. As to the range hood, Willis testified that one invoice was for a 30" range hood above the stove but could not recall what the invoice for the other range hood was for, simply that the invoice stated "conver range hood." However, he testified that it could have been the supplier's way of describing an exhaust fan or something of that nature but that, in any event, he only purchased one range hood for above the stove.

{¶10} As for the questions concerning some of his invoices, although Willis did not have documentation that each invoice was paid, he testified to paying these invoices and was able to recall how most of the invoices were paid, i.e. cash, credit card, etc. Willis was also questioned as to why he had paid his son for the work Adam did on the home but did not compensate Beverly's son for his work. Willis testified that Charles lived in his home for four years, including the new home on Stella Street without paying rent, so he felt that was sufficient. Willis also acknowledged that Beverly owned the Stella Street property and that she refinanced the property for $85,000 during the home's construction and gave

him $50,000 from the mortgage proceeds to pay for expenses in building the new house.

{¶11} Beverly produced the deed showing that she had owned the property since 1985. No evidence was presented concerning its value prior to the construction of the new home. Beverly testified that, during the construction, Willis complained he was running low on money and that he wanted her to get a loan. Therefore, in January 2002, Beverly obtained a mortgage for $85,000. She used the money to pay off the existing mortgage of $11,745.98 that she had on the property, $11,483.14 was used to pay off the drywall and windows she had purchased to put in the old house, $1,711 was used to pay off a credit card of Beverly's, $5,131 was used to pay off her car loan, and she gave Willis $50,000 for expenditures on the new house.

{¶12} After they were married, Willis believed that they could get a better interest rate on a new mortgage using his credit rating. In August 2003, at Willis' urging, they refinanced the property for $96,000. This money was used to pay off the existing mortgage from January 2002, and to pay other bills of Beverly's, including medical bills from Mercy County hospital, NCO Financial, and Progressive. In order to obtain this financing, the mortgage broker required the mortgage and deed to be in both parties' names. Beverly testified that she did not intend to give Willis her interest in the real estate; she was simply signing the

documents they asked her to complete in order to obtain the loan. Beverly testified that she had paid the mortgage payments on all of the mortgages that had existed on the property from her money and provided her check registers and bank statements to support her testimony.[2]

{¶13} At the time of the separation in January 2006, the mortgage balance was $89,518.34. Both parties agreed that the value of the home and property was $94,000, based upon a May 2008 appraisal.

{¶14} On December 15, 2008, the magistrate issued findings of fact and conclusions of law. The magistrate found that the property located at 205 Stella Street was Beverly's separate property prior to the marriage and awarded the house and property to Beverly. The magistrate found that the fair market value of the property was $94,000, and the value of the mortgage at the time of the separation was $89,500, leaving $4,500 in equity. Beverly was ordered to pay Willis $2,250 as his one-half share of the marital equity in the real estate. The magistrate did not find that Willis' testimony and exhibits regarding how much of his separate property he put into the construction of his new home was credible because (1) he paid his son for work done on the home but not Beverly's; (2) there were duplicate receipts for the same item; and (3) there were invoices with no evidence that any money was paid towards the home.

---

[2] Willis and Beverly maintained separate checking accounts and did not comingle their funds, even during the marriage, except for one brief period when Willis added Beverly's name to an account.

{¶15} In addition, the magistrate specifically awarded certain items of personal property to each party, and all other items were to be divided with the parties meeting and making alternating choices based upon a coin toss. Each party was to keep any motor vehicles, stocks, bonds, retirement benefits and bank accounts currently titled in their own name, and each party was responsible for any debt incurred in his or her own name. Willis was responsible for payment of any debt incurred for the motor vehicles.

{¶16} Willis filed timely objections to the magistrate's decision. On April 6, 2009, the trial court overruled all the objections with the exception of clarifying the portion of the decision pertaining to the coin toss. On April 14, 2009, the trial court issued the final divorce decree, following the magistrate's recommendations. However, due to a clerical error, the trial court issued a new judgment entry on February 9, 2010, assigning the mortgage debt on the property to Beverly.

{¶17} This appeal followed, and Willis now asserts five assignments of error for our review.

## ASSIGNMENT OF ERROR I

**The trial court erred to the prejudice of [Willis] when it failed to determine that he used $113,940.54 of his premarital funds to improve the Stella Street residence.**

**ASSIGNMENT OF ERROR II**

**The trial court erred to the prejudice of [Willis] when it determined that the equity in the Stella Street home was only $4,500.00.**

**ASSIGNMENT OF ERROR III**

**The trial court abused its discretion when it failed to equally divide the marital debts of the parties.**

**ASSIGNMENT OF ERROR IV**

**The trial court erred [sic] abused its discretion when it failed to equally divide the marital assets of the parties.**

**ASSIGNMENT OF ERROR V**

**The trial court applied the wrong standard of review in considering the magistrate's decision.**

{¶18} The first four assignments of error assert that the trial court erred in allocating and dividing the parties' marital and separate property and their debts. It is well-settled that trial courts have "broad discretion to determine what property division is equitable in a divorce proceeding." *Cherry v. Cherry* (1981), 66 Ohio St.2d 348, paragraph two of the syllabus, 421 N.E.2d 1293. A trial court's decision allocating marital property and debt will not be reversed absent an abuse of discretion. *Jackson v. Jackson*, 3d Dist. No. 11-07-11, 2008-Ohio-1482, ¶ 15, citing *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597. An abuse of discretion is more than a mere error; it implies that the court's attitude is

unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

*First Assignment of Error*

**{¶19}** In his first assignment of error, Willis claims that the trial court erred when it did not find that he was entitled to be fully compensated for all of the premarital funds that he claims he spent building their new home on the Stella Street property. He maintains that he presented 199 exhibits tracing in excess of $113,000 of his premarital funds that he spent, and therefore, the court was required to reimburse him for his separate property.

**{¶20}** A trial court is charged with the duty of distinguishing between marital property and separate property in accordance with the definitions set forth in R.C. 3105.171(A). *Lust v. Lust*, 3d Dist. No. 16-02-04, 2002-Ohio-3629, ¶ 12. Marital property includes property that is currently owned by either or both spouses and that was acquired by either or both of the spouses during the marriage. R.C. 3105.171(A)(3)(a). Property acquired during a marriage is presumed to be marital property unless it can be shown to be separate. *Barkley v. Barkley* (1997), 119 Ohio App. 3d 155, 160, 694 N.E.2d 989.

**{¶21}** Separate property is defined by R.C. 3105.171(A)(6)(a), and includes any real or personal property, or interest in such, that was acquired by one spouse prior to the date of the marriage. *Neville v. Neville*, 3d Dist. No. 9-08-37,

2009-Ohio-3817, ¶ 11.  The commingling of separate property with other property does not necessarily destroy the identity of the separate property, except when the separate property is not traceable.  R.C. 3105.171(A)(6)(b).  Therefore, traceability is the main issue in determining whether separate property has become marital property due to commingling.  *Earnest v. Earnest*, 151 Ohio App.3d 682, 785 N.E.2d 766, 2003-Ohio-704, ¶ 38, citing *Peck v. Peck* (1994), 96 Ohio App.3d 731, 734, 645 N.E.2d 1300.  Separate property can be converted to marital property if one spouse grants the other spouse an interest in the property.  *Jackson,* 2008-Ohio-1482, at ¶ 7.  The general rule with regard to separate property is that the trial court must disburse a spouse's separate property to that spouse. R.C. 3105.171(D).  Nevertheless, the trial court has broad discretion in dividing property equitably in a divorce.  *Berish v. Berish* (1982), 69 Ohio St.2d 318, 319, 432 N.E.2d 183.

**{¶22}** Although the trial court questioned the validity and credibility of some of Willis' expenditures, the record shows that he did provide legitimate documentation for numerous costs involved in the construction of the new home. However, he also acknowledged that Beverly repaid him $50,000 for many of those expenditures; therefore, his claim that he is entitled to reimbursement in the full amount of $113,904.54 is without merit.  Nevertheless, the magistrate found

> **2.   When the parties were residing together, they lived at 205 Stella Street, Celina, Ohio.  Evidence proved that the Defendant**

-11-

> **purchased the home in February 1985, the same is her separate property. Prior to the marriage, Plaintiff put approximately $50,000 into the home making the home more habitable. There were some issues with the home including a flooded basement, etc. Into 2002 prior to the party's marriage, Defendant took out a loan and repaid the Plaintiff $50,000. The money was placed directly into the Plaintiff's checking account. Throughout their marriage the parties maintained separate checking accounts. They did not co-mingle any funds. At one point in time after the marriage a loan was taken by the Defendant in her sole name. She was advised by the mortgage broker to transfer one-half interest of the home to the Plaintiff.**
>
> **\* \* \***
>
> **5. The evidence did establish that Defendant repaid the Plaintiff $50,000 for the money he put into the home prior to the parties' marriage.**

These findings contain at least two inaccuracies. First, Defendant's Exhibit F, a copy of the August 2003 re-financing indicates that both Willis and Beverly borrowed this money. Second, and more importantly, Willis did not put approximately $50,000 into the old house to make it more habitable, and Beverly did not re-pay him $50,000 for so doing. Rather, the parties agreed that while Willis was building the new home, using his own monies, Beverly re-mortgaged the property and gave Willis $50,000 because he needed more money to continue the project. Thus, this $50,000 was not associated with making the old home more habitable.

{¶23} Beverly did not provide exact figures and receipts for her contributions, but the record shows that the property the home was built upon was

her premarital property. Beverly produced banking records proving that she had been responsible for making the mortgage payments for the property, both before and after they were married. In addition, some of the drywall she purchased for the old house and one of the windows she purchased were used in the construction of the new home. However, Beverly acknowledged that all of the windows, with the exception of the one bay window used in the new home, were still in her possession. Further, with the exception of the range hood, a few exhibits that counsel for Beverly questioned whether Willis had a receipt showing payment received, and the payments to Willis' son, Beverly presented no evidence or testimony to dispute Willis' expenditures on the construction of the home.

{¶24} The record clearly demonstrates that both Beverly and Willis contributed premarital funds and assets to the home before they were married and both had marital interests in the home after they were married. Unfortunately, the home's present value is considerably less than the total amount of money that both parties' contributed. Whether the parties invested more money into the property than it was ever worth or if it has lost value due to current market conditions is unknown.

{¶25} The trial court awarded Beverly possession of the real estate that she had owned as her separate property for eighteen years prior to the marriage. The parties also had marital interests in the property due to the payments and

improvements to the property made during the nearly three years that they were married and living together in the home. The trial court equally divided the marital equity in the home between the two parties, thereby acknowledging the contributions of both Beverly and Willis. However, despite the extensive documentation provided by Willis and largely undisputed by Beverly, the trial court found Willis' evidence regarding his premarital funds to not be credible. Thus, the trial court did not find that *any* of his contributions were his separate property.

{¶26} As previously noted, the commingling of separate property with marital property does not destroy the identity of the separate property as long as the separate property can be traced. Here, Willis provided nearly 200 exhibits to document the money he expended in building the new house, including invoices from suppliers, copies of his personal checks to pay the majority of these suppliers, and receipts for smaller purchases for the home. He also testified what each was, that they represented expenditures for the new home, and how most of these were paid.[3] He acknowledged that Beverly gave him $50,000 for the home's construction but the remainder came from his separate monies. Despite this extensive tracing, the trial court disregarded his testimony because he had two

---

[3] On some of the smaller purchases Willis was unable to directly re-call what was purchased but explained that he was not working on any other building project at the time so the receipts were all for the Stella Street home.

receipts that described a range hood purchase that Willis could not account for the apparent duplication, because he paid his son for the work on the home but not Beverly's, and because some of the invoices (no specific ones mentioned) did not include proof that they were paid. We find that the trial court's decision in this regard was unreasonable and arbitrary.

{¶27} First, the range hoods at issue were valued at $61.49 and $43.99, respectively, both paltry sums given that the cost to build the home was in excess of $100,000. Second, Willis' unrefuted testimony was that he paid for each purchase with cash, check, or his personal credit card. He had numerous items to show proof of payment, including many cancelled checks and receipts from the supplier. Additionally, there is no evidence in the record that any suppliers went unpaid or that the property had mechanic's liens on it due to work that was performed by a contractor that went unpaid. Lastly, Beverly did not dispute that Adam Gilleo worked on her home. Further, her son, Charles, never testified that he was promised payment for the services he provided in building the home. If Charles worked on the home and believed he was owed payment for doing so, then it would be incumbent on him to attempt to be paid. Whether he is owed money has nothing to do with whether Willis has traced his separate property. Moreover, the payments made to Adam total less than $2,000, yet again another small amount in the overall cost to build the new home.

{¶28} Certainly the trial court was free to not believe the legitimacy of the payments to Adam Gilleo and the receipts for the range hoods. However, to discount the remainder of undisputed and largely documented evidence of Willis' pre-marital contributions to the home was unreasonable and arbitrary. Rather, the trial court should have simply deducted those amounts that it discredited. Therefore, in as much as the first assignment of error challenges the trial court's failure to find *any* of the premarital funds contributed by Willis to the construction of the new home to be his separate property, it is sustained.

{¶29} Accordingly, we reverse and remand this matter to the trial court to determine what amount of pre-marital funds contributed by Willis to the construction of the new home was sufficiently traced in accordance with the proper weight of the evidence and what amount should be awarded to him as his separate property in a manner consistent with this opinion and in recognition of the greatly diminished value of both parties' contributions to the property.

*Second Assignment of Error*

{¶30} In his second assignment of error, Willis maintains that the trial court erred when it calculated that the equity in the Stella Street home was only $4,500. He asserts that the trial court did not take into consideration that a "large portion" of the existing mortgage was used to pay off Beverly's premarital debts and to repay him for his personal expenditures in the home. He further contends

that this portion of the current mortgage should not count towards reducing the equity in the property.

{¶31} Our review of the record shows that the majority of the funds from the two mortgages were used to pay expenses associated with the home's construction and the property, and therefore, rightfully reduced the value of the equity in the home. Moreover, the second refinancing mortgage for $96,000 was agreed to by Willis, it occurred during the marriage in August 2003, and was in both parties' names. Out of the $85,000 mortgage obtained by Beverly in January 2002, $11,745.98 was used to pay off the previous mortgage on the property, which essentially, was paying off the land the new home was being built upon. However, $11,483 went to pay off the windows and drywall that were purchased with the intention of repairing the original residence. Only one window and an unspecified amount of drywall were used in the new home, the remainder of which is in Beverly's possession. Nevertheless, Willis built the new home and chose what materials to use, including leaving the other windows unused and in storage for nearly five years by the time the parties separated. Thus, we cannot find that the trial court acted unreasonably in including this amount to determine the equity in the home.

{¶32} From the $85,000 mortgage proceeds, there were two smaller amounts that were used to pay off expenses that were Beverly's premarital debts.

We note that because of the refinancing, Beverly's mortgage payments increased significantly. Prior to the construction project, Beverly was paying only $240 a month on her mortgage. After Willis requested her to obtain the $85,000 mortgage in 2002 to finance the rest of the construction, her monthly payments increased to over $690, and then they further increased to $774 after the couple refinanced together in 2003. It was not unreasonable for Beverly to consolidate her payments in order to be able to afford to make the house payments, and the trial court did not abuse its discretion by including these amounts in the determination of the home's equity.

{¶33} Finally, Willis contends that the $50,000 that Beverly gave him for the construction costs should not count towards reducing the equity because he contends that it "reversed the 'repayment' that he was entitled to receive." This reasoning is not accurate. The $50,000 was used to pay for the home's construction expenses. If Beverly had kept the $50,000 herself and used it to directly pay for the construction materials and services, Willis' expenditures would have been reduced by $50,000 and there would be no question that the $50,000 obtained from the mortgage was a legitimate building expense included in the mortgage. Simply because the construction payments were funneled through Willis does not render them a reversal of his repayment. Therefore, the trial court properly included this amount in determining the equity of the property.

**{¶34}** For all of these reasons, we do not find that the trial court's calculation of the equity in the home was unreasonable or arbitrary. Accordingly, Willis' second assignment of error is overruled.

*Third Assignment of Error*

**{¶35}** In his third assignment of error, Willis asserts that the trial court abused its discretion when it held him solely responsible for the $11,548.88 debt (plus interest and court costs) owed to GMAC as a result of the repossession of the Grand Prix before the end of the lease term. Willis claims that this was a marital debt that should be divided equally between the parties.

**{¶36}** The determination of debt as marital or separate is reviewed under the manifest weight of the evidence standard. *Gosser v. Gosser*, 11th Dist. No. 2006-T-0029, 2007-Ohio-3201, ¶ 29. A trial court's judgment will not be reversed as being against the manifest weight of the evidence if the court's judgment is supported by some competent, credible evidence. This highly deferential standard of review permits the affirmation of the trial court's judgment if there is even "some" evidence to support the court's finding. *DeWitt v. DeWitt*, 3d Dist. No. 9-02-42, 2003-Ohio-851, ¶11 (internal citations omitted).

**{¶37}** Although the Grand Prix was acquired while the parties were married in May 2005, the testimony indicated that Willis was in complete control over purchasing, leasing, trading, and selling all of the parties' vehicles, before,

during, and after the separation and marriage. Willis leased the Grand Prix in his name only, he drove it, and he was the one in charge of making the payments. Most importantly, when the couple separated in January 2006, Willis took both the Grand Prix and the parties' other vehicle with him and did not offer Beverly an opportunity to keep or make the payments for either one.

{¶38} Traditionally, the time "during a marriage" concludes with the marriage ending on the date of the final hearing. *Dill v. Dill,* 179 Ohio App.3d 14, 20, 2008-Ohio-5310, 900 N.E.2d 654, ¶ 9. However, the trial court has the discretion to select other dates when determining the distribution of marital property and debt, if the result would be more equitable. Id. Generally, a trial court's determination of whether to utilize a de facto termination of marriage date is upheld on appeal. Id. at ¶12.

{¶39} Although the GMAC judgment technically occurred "during the marriage" prior to the final divorce decree, it was *after* Willis' and Beverly's separation date. The parties and the trial court used the January 16, 2006 date of separation to value the mortgage balance and, in every other way, treated that date as the end of the marriage. The repossession of the Grand Prix occurred after the separation date and the GMAC settlement document stating Willis still owed $11,553.88 was dated September 15, 2006. Although Willis claimed that he could not afford to make the payments on both of the vehicles, the record shows that he

had over $100,000[4] in his bank account in December 2005, and that over $72,000 remained in his account at the time of the separation. Willis allowed the Grand Prix to be repossessed when he had exclusive use and control over the vehicle, after the separation date, and he did not do anything to prevent the judgment.

{¶40} The trial court did not abuse its discretion by holding Willis responsible for the debts associated with the vehicles that he retained and controlled after the parties' separation date. Thus, the third assignment of error is overruled.

*Fourth Assignment of Error*

{¶41} In his fourth assignment of error, Willis contends that the trial court abused its discretion when it determined that it did not have sufficient evidence to divide all of the marital assets that were in dispute. The trial court awarded Willis his dresser, birth certificate, suitcases, and one-half the wedding pictures and family photos. Beverly was allowed to keep the high-pressure washer, curtains, coffee maker, silverware, and dishes. All the other items were to be divided with the parties meeting and dividing the property with alternating choices, with the first choice awarded by a coin toss. Willis contends that there was sufficient evidence available to allow the court to equally divide all of the contested marital

---

[4] Apparently this money was from a retirement account that was Willis' separate property.

property, including the chest freezer, grandfather clock, space heater, Christmas decorations, living room furniture, wheel barrow, and an extension ladder.

**{¶42}** There was considerable testimony about these household items, but most of it was conflicting. Beverly said she bought the pressure washer for the house, and he claimed that it was a gift to him from Beverly. Willis testified that the parties bought the living room furniture together, and Beverly testified that she had paid for it on layaway when she was dating a previous boyfriend. Their testimony acknowledged that the current depreciated value of many of the items would be quite low.

**{¶43}** As discussed above, a trial court is granted broad discretion in determining how to award an equitable property division according to the circumstances of each case before it. In determining whether the decision was fair, equitable, and in accordance with the law, an appellate court cannot substitute its judgment for that of the trier-of-fact unless the trial court's decision amounts to an abuse of discretion. *DeWitt*, 2003-Ohio-851, at ¶ 10 (internal citations omitted).

**{¶44}** Given the discrepancies in most of the testimony concerning these items, we do not believe that the trial court abused its discretion when it left it up to the two parties to divide the remaining personal property. By alternating choices, they will have control over effectuating a fairly equally valued allocation

of the property if they so choose. Therefore, the fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶45} In his final assignment of error, Willis states that the trial court utilized an incorrect standard of review when it ruled on his objections to the magistrate's decision. Willis complains that the trial court failed to make a sufficient independent analysis and to substitute its own judgment where necessary.

{¶46} Pursuant to Rule 53(D)(4)(d) of the Ohio Rules of Civil Procedure, when objections are filed to a magistrate's decision, the trial court must independently review the objected matters to decide if the magistrate properly determined the factual issues and appropriately applied the law. *Brandon v. Brandon,* 3d Dist. No. 10-08-13, 2009-Ohio-3818, ¶ 31; *Davidson v. Davidson*, 7th Dist. No. 07 BE 19, 2007-Ohio-6919, ¶ 2. When examining whether a trial court has conducted the required independent review of a magistrate's decision, appellate courts "generally presume regularity in the proceedings below, and, therefore, we generally presume that the trial court conducted its independent analysis in reviewing the magistrate's decision." *Mahlerwein v. Mahlerwein*, 160 Ohio App.3d 564, 2005-Ohio-1835, 828 N.E. 2d 153, ¶ 47. Therefore, the party who asserts that the trial court did not conduct such a review bears the burden of

affirmatively demonstrating the trial court's failure to perform its duty. Id.; *Figel v. Figel*, 3d Dist. No. 10-08-14, 2009-Ohio-1659, ¶ 2.

**{¶47}** Willis asserts that the trial court incorrectly gave too much deference to the magistrate's findings as to the evidence and credibility of the witnesses based upon the trial court's statement in the judgment entry that "it is the Magistrate's responsibility to weigh the evidence which requires the Magistrate to determine the credibility of the witnesses." The record does not support Willis' contention. While a trial court is required to independently review the record and make its own factual determinations, the trial court may rely upon the magistrate's credibility determinations when it reviews the magistrate's decision. *Hendricks v. Hendricks*, 3d Dist. No. 15-08-08, 2008-Ohio-6754, ¶ 25, citing *Osting v. Osting*, 3d Dist. No. 1-03-88, 2004-Ohio-4159.

**{¶48}** The record contained conflicting testimony from the parties, so the trial court was allowed to rely on the magistrate's assessments of the parties' credibility. The trial court's judgment entry noted that, "the testimonies of the plaintiff and the defendant tell 'two very conflicting stories' *** regarding the individual financial contributions to the primary asset at issue, the residence at 205 Stella Street, Celina, Ohio."

**{¶49}** In addition, there were several references in the judgment entry where the trial court affirmatively stated that it had indeed made its own

independent review of the record. An appellate court presumes that the trial court did exactly what it said it did. *Figel*, 2009-Ohio-1659, at ¶ 11, citing *Betz v. Timken Mercy Med. Ctr.* (1994), 96 Ohio App.3d 211, 216, 644 N.E.2d 1058. In its April 6, 2009 judgment entry, the trial court specifically stated that it had "undertaken an independent review as to the objected matters to ascertain whether the Magistrate has properly determined the factual issues and appropriately applied the law." It further indicated that "[b]ased upon its review of the transcript, the court finds and concludes that the evidence is sufficient to support the findings of fact and conclusions of law made by the Magistrate in the decision filed December 15, 2008." The trial court also demonstrated it had reviewed the record by including quotations from the transcript and other specific references to the record. Moreover, although the trial court adopted the majority of the magistrate's decision, it did modify a portion of it.

**{¶50}** With the exceptions of the matters previously addressed under the first assignment of error, there was ample evidence that the trial court met its obligations to conduct an independent review under Civ.R. 53(D)(4)(d). Therefore, Willis' fifth assignment of error is overruled.

**{¶51}** For all of these reasons, the judgment of the Common Pleas Court, Domestic Relations Division, of Mercer County, Ohio, is affirmed in part,

Case No. 10-10-07

reversed in part, and the matter remanded for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAWOSKI, P.J., and PRESTON, J., concur.**

**/jlr**