[Cite as *Petersen v. Nonnenman*, 2025-Ohio-794.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

PATRICK A. PETERSEN,

    PLAINTIFF-APPELLEE,

  v.

ASHLEY M. NONNENMAN,

    DEFENDANT-APPELLANT.

CASE NO. 7-24-09

O P I N I O N

---

Appeal from Henry County Common Pleas Court
Domestic Relations Division
Trial Court No. 23DR0082

Judgment Affirmed

Date of Decision: March 10, 2025

---

APPEARANCES:

    *Rebecca E. Shope* for Appellant

    *Margaret G. Beck* for Appellee

**WALDICK, P.J.**

{¶1} Defendant-appellant, Ashley Nonnenman ("Ashley"), appeals the August 5, 2024 judgment of the Henry County Court of Common Pleas, Domestic Relations Division, granting a divorce to plaintiff-appellee, Patrick Petersen ("Patrick"). For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on December 5, 2023, when Patrick filed a complaint for divorce against Ashley. After several months of pretrial proceedings, a final hearing on the complaint was held before the trial court on April 1, 2024 and April 22, 2024.

{¶3} On August 5, 2024, the trial court filed a judgment entry in which the court granted Patrick's complaint for divorce, upon the stipulated ground of incompatibility, and in which final orders were entered relating to the division of marital assets and debt, spousal support, and other pertinent issues.

{¶4} On August 23, 2024, Ashley filed this appeal.

*Summary of Evidence Presented at Final Hearing*

{¶5} At the final hearing held on April 1, 2024 and April 22, 2024, it was established that Patrick and Ashley met and began dating in January of 2022. By May of that year, Ashley had moved into Patrick's home, which is a rented half of a duplex in Napoleon, Ohio that Patrick had been leasing and living in since August of 2018.

**{¶6}** Patrick and Ashley were married on May 26, 2023. No children were born as issue of the marriage.

**{¶7}** On November 26, 2023, Patrick moved out of the marital home. Patrick testified that his decision to leave resulted from the parties' continual arguments over finances and the fact he received a text from Ashley that appeared to relate to her being unfaithful. On December 5, 2023, Patrick filed for divorce. Ashley continued to live in the rented marital residence during the pendency of the divorce.

**{¶8}** Beginning in January of 2024, pursuant to temporary orders imposed by the trial court, Patrick paid the following monthly expenses during the pendency of the divorce: $800.00 in full rent for the marital home, $250.00 for utilities at the marital home, and $1800.00 in temporary spousal support to Ashley. The trial court also issued a temporary order requiring Patrick to make a one-time payment of $1,000.00 on Ashley's car lease, which he did. While the divorce action was pending, Patrick also continued to pay for Ashley's car insurance each month, as well as making payments on two rather significant charges made by Ashley during that timeframe on his business's Affirm account, which is a program through which short-term credit is extended for retail purchases at the point of sale. Patrick testified that those charges were not authorized by him and included a $750.00 charge for hair extensions and another $750.00 charge that Ashley claimed was for Apple AirPods she bought her adult son. Contrary to Patrick's testimony, Ashley testified that the AirPods were a birthday gift for her son that she and Patrick had discussed

ordering. Ashely testified that she did not know why her hair extensions were charged to Patrick's Affirm account. During the pendency of the divorce action, Patrick also took sole responsibility for making payments on at least three credit cards previously used by the couple. While the divorce was pending, Ashley also charged multiple counseling appointments to one of Patrick's credit cards without his permission, which he then also became responsible for paying.

{¶9} At the time of the hearing, Patrick had been employed by Miller Brothers for 16 years and was working then as an asphalt milling superintendent. Patrick's employment with Miller Brothers was seasonal, and he typically worked six to seven months per year for that company. In 2023, Patrick's gross income from that job was $136,970.33, based on having worked an average of 74 hours per week for the months that work was available, depending on the weather. In the winter months, Patrick had no income from Miller Brothers and did not draw unemployment benefits. Rather, he lived on savings accumulated during the months he actively worked.

{¶10} In an attempt to earn supplemental income during the winter months, Patrick started a truck-driving business in January of 2020 called All Class Hauling, LLC. However, due to having borrowed large sums of money to purchase two semi-trucks and due to unanticipated business expenses, such as pricey truck repairs, the business had not yet made any profit as of the time of the divorce hearing. At that time, the business owed approximately $145,000.00 on the two trucks, and another

$7,000.00 for an engine repair. Patrick testified that there was no equity in either of the trucks, the business had no other assets, the business had never shown a profit, and he had never drawn an income from the business. On cross-examination of Patrick, it was established that his business checking account records showed a balance of $27,188.52 at the time of the marriage and a $39,028.10 balance in December of 2023, when the parties separated. However, it was also established that the business owed over $3,000.00 per month for insurance, and that expense was in addition to the required monthly payments for the large loan used to buy the two trucks. Ashley testified that Patrick's business had assets, being the two semi-trucks, but no evidence was presented as to the value of those trucks. Ashley also testified that she was not seeking anything in the divorce from Patrick's business checking account.

{¶11} When Patrick and Ashley began dating in January of 2022, Ashley was working as an esthetician at a doctor's office in the Dayton, Ohio area, where she had worked for at least two years. Ashley's income varied over time but she made $21,738.00 in 2021 and she testified that she had made approximately $70,000.00 working as an esthetician in 2018 or 2019, prior to starting nursing school. Once she moved in with Patrick in May of 2022, Ashley commuted from Napoleon to her job in Dayton several days per week. In late 2022 or early 2023, she left that job. Patrick testified that Ashley told him she was fired from that job for unclear reasons. Ashley testified that she left the job due to health issues, which she described as

female-related, being heavy periods, fatigue, and mental fog. Ashley testified that she also had anxiety, for which she received counseling and took prescription medication. Once Ashley left the Dayton-area job, she had no other source of income. Patrick testified that once Ashley lost that job, he encouraged her to look for work in northwest Ohio. Ashley had graduated from nursing school in 2021, but repeatedly declined to take the NCLEX, which is the nursing licensure exam. The NCLEX is given on numerous dates throughout any given year. Patrick paid for Ashley to take the NCLEX but she never did. Ashley testified that she did not seek work after leaving her job in Dayton because Patrick told her she did not need to work. Ashley then changed her testimony to say her unemployment was not voluntary but, rather, due to her health issues. Patrick testified that Ashley's claim that he told her she did not need to work was absolutely not true and he had always anticipated that Ashley would maintain employment and contribute to their finances. At the time of the hearing in April of 2024, Ashley testified that she was scheduled to take the NCLEX on May 6, 2024.

{¶12} For his personal vehicle, Patrick testified that he drives a Cadillac Escalade, which he purchased in July of 2020. At the time of the hearing, Patrick was still making payments on the Escalade, which were approximately $700.00 per month, and he still owed approximately $14,000.00 on that vehicle. Patrick testified that the Escalade also needed about $8,000.00 in repair work, based on an estimate he had received. Based on the current value of the Escalade, which was not

specified at the hearing, Patrick testified that he was "upside down" on that vehicle, meaning he owed more on the vehicle than it was worth at that time.

{¶13} As to assets, Patrick testified that he has a pension plan through his union, stemming from his job with Miller Brothers. His pension statements reflected $75,202.77 in total lifetime contributions at the end of 2023, and that amount had grown to $80,864.29 by the end of 2024. Patrick also has three hotel loyalty accounts in his name with substantial point balances, resulting from the travel required by his position with Miller Brothers. Patrick testified that, while the divorce action was pending, Ashley used a large number of his hotel points, without his permission, to pay for three different hotel stays. Ashley testified that she paid for one of those stays herself, but acknowledged that she had used Patrick's hotel points without his knowledge on at least one occasion after they separated.

{¶14} At the time of the hearing, Patrick's only other asset was a personal checking account, in his name only, at Corn City Bank. While the divorce was pending, Ashley made an unauthorized payment through that account to her attorneys in the amount of $2,000.00, which the bank subsequently returned to Patrick on the basis of a fraudulent transaction. At or near that time, Ashley also cashed a $400.00 check that she wrote on that account and to which she signed Patrick's name without his approval or knowledge. When Patrick reported that forgery to the bank, he opened a new checking account into which he deposited all of the funds in the preexisting account, in order to protect the funds from misuse by

Ashley. As to the value of the checking account funds, the checking account had a balance of $8,756.63 at the time of the parties' marriage in May of 2023. At the time of the hearing in April of 2024, that checking account had a balance of just under $12,000.00. However, the balance at the end of February of 2024 had been $31,459.80. The funds in that account had dwindled over the time the divorce was pending due to Patrick's various financial obligations and other expenditures.

{¶15} Ashley testified that she has a personal checking account that she opened with her mother after Patrick had filed for divorce in December of 2023. At the time of the hearing, that account had a balance of just over $200.

{¶16} With regard to debt, Patrick testified that there were outstanding balances on several credit card accounts that were in his name but which both he and Ashley had used during the course of their relationship.

{¶17} The first card, a Capital One Mastercard (#2918) had a balance of $8952.67 in July of 2022, when the account was first opened. While the account was in Patrick's name, Ashley was also provided with a card in her name that was tied to the account. Ashley used that card over time, adding rather significant sums to the accumulation of debt on the account. Account records reflect that the balance owed would go up, then down, and then up again as Patrick made payments on the card while the couple also simultaneously continued to use the cards for expenditures. At or near the time of their marriage in May of 2023, that account had a balance owed of $12,155.57. At the time Patrick filed for divorce in December

of 2023, the balance was $12,566.23. As of the date of the hearing, that credit card account had a balance of $11,500.00.

{¶18} A second credit card account, being a different Capital One credit card (#3221), was also in Patrick's name but, in July of 2022, Patrick added both Ashley and her son to the account as authorized users. At that time, records show that the card balance was $3,414.45. Once added to the account, Ashley's son used that credit card sparingly, but Ashley used the card quite regularly. At the time of the marriage in 2023, the card balance was just over $4,700.00. At the time that Patrick filed for divorce, the balance was $3,902.81. At the time of the hearing, Patrick had paid down that debt to a balance of approximately $3,700.00.

{¶19} A third credit card account at issue related to a Discover credit card (#3006) that Patrick opened for Ashley's primary use in July of 2022. As with the other credit card accounts, the Discover account itself was in Patrick's name only, but Ashley was an authorized user on the account. In the first month, Ashley made purchases on that card that totaled $963.19. By the second month, the card balance was $2,373.23, which included some purchases made by Patrick but primarily stemmed from Ashley's use of the card. The third monthly statement reflects that Patrick made a $1,400.00 payment on the card balance but that Ashley made new purchases totaling nearly $1,300.00. Two months after that, the balance had ballooned to over $8,400.00. That Discover card account had a balance of over $9,000.00 just prior to the couple getting married. That account had a balance of

$9,712.45 at the time Patrick filed for divorce. At the time of the hearing, that card had a balance of approximately $9,350.00.

{¶20} On all of the above-referenced credit card accounts used by the couple throughout the course of their relationship, Patrick always made the monthly payments from his own earnings and Ashley never contributed any funds toward paying on the account balances. Patrick testified that he repeatedly urged Ashley to get a job and contribute to their household finances, but yet she never did. The testimony reflected that Ashley's only financial contribution to household expenses during the course of the parties' relationship was helping to purchase groceries back in 2022 when the couple initially began living together. After a few months, Ashley then used the credit cards to buy groceries. Both parties agreed that Patrick paid for all household and living expenses during their marriage, which also included Ashley's health insurance, her car insurance, her medical and counseling expenses, and her car's lease payment.

{¶21} Ashley testified that, at the time of the hearing, she was still living in the marital residence, being the rented duplex, because her temporary spousal support did not provide adequate funds for her to move and pay for an apartment. Ashley testified that her personal vehicle was a leased 2022 Acura MDX that she began leasing in 2021, and upon which the lease had just expired.

{¶22} At the hearing, Patrick requested that the funds in his personal checking account be awarded to him and that he be permitted to keep his trucking

business and the Cadillac Escalade. He requested that Ashley be ordered to pay her fair share of the debt they had accumulated together, and that he receive credit for the funds he had spent on Ashley's behalf since filing for divorce. Finally, Patrick requested that his temporary spousal support obligation be terminated.

{¶23} On the other hand, Ashley requested that she be awarded half of the increase in the funds in Patrick's personal checking account, based on the difference between the balance in that account at the time of the marriage and the balance at the time Patrick filed for divorce. Ashley also asked that she be given half the equity that had accrued in Patrick's Cadillac Escalade during the time they were married, based on her definition of "equity" as the total amount of money paid by Patrick on that vehicle while they were married. Ashley also requested an award of spousal support for several months in the amount of $3,000.00 per month. Finally, Ashley asked that Patrick be responsible for all debt on any of the credit cards in his name, notwithstanding their joint use of the same, and she also requested that he be ordered to pay a portion of her attorneys' fees stemming from the divorce.

*Summary of Trial Court's Decision*

{¶24} In the August 5, 2024 judgment entry of divorce, the trial court determined that the de facto date of the termination of the marriage was December 5, 2023, being the date on which the complaint for divorce was filed.

**{¶25}** The trial court granted Patrick exclusive use of the marital residence as of June 1, 2024.[1] Each party was awarded any household goods that belonged to him or her prior to the marriage, and any personal property purchased together during their marriage was ordered to be divided as equally as possible between them.

**{¶26}** With regard to vehicles, it was ordered that Patrick retain the Cadillac Escalade and any vehicles used by or titled to his business, and that he be responsible for any indebtedness thereon. The trial court further specifically ordered that Ashley was not entitled to an award relating to any equity in any vehicle in Patrick's name. It was ordered that Ashley retain the Acura leased in her name, and that she be responsible for any indebtedness thereon.

**{¶27}** The trial court ordered that Patrick retain any hotel points in his hotel loyalty program accounts.

**{¶28}** Ashley was awarded a marital portion of Patrick's pension, based on the time period from May 26, 2023, when the parties were married, until December 5, 2023, when the divorce action was filed, with a qualified domestic relations order to be prepared to effectuate that order.

**{¶29}** With regard to Patrick's personal checking account, the trial court determined that Ashley was entitled to $11,620.28, being one half of the $23,240.56

---

[1] Following the completion of the divorce hearing but prior to the final judgment entered on August 5, 2024, the trial court issued a temporary order to that same effect.

that had accumulated in that account over the course of the marriage. Patrick was granted any funds in his business bank account, and Ashley was granted any funds in her personal checking account opened in December of 2023.

{¶30} With regard to the credit card debt testified to at the hearing, the trial court ordered that the parties be responsible for that debt as follows.

{¶31} As to the Capital One Mastercard (#2918), the trial court found that both parties used that card for various expenses during the marriage. The trial court found that the account had a balance of $12,004.20 as of the date of marriage and a balance of $12,566.23 as of the date the divorce was filed, making the balance on that account $562.03 higher at the time Patrick filed for divorce than the balance had been at the time of the marriage. The trial court ordered that the parties equally split responsibility for that $562.03, with each party being responsible for paying $281.02 on that debt. The trial court further ordered that the $281.02 to be paid by Ashley toward that credit card debt be deducted from the $11,620.28 that she was awarded from Patrick's personal checking account.

{¶32} As to the other Capital One credit card (#3221), the trial court found that there was a $5,426.23 balance on that account at the time of the marriage, and a $4095.60 balance at the time the divorce action was filed. The trial court ordered that there would be no division of that debt and ordered that Patrick take full responsibility for any indebtedness on that account.

{¶33} With regard to the Discover credit card (#3006), the trial court found that there was a $9,404.99 balance on that account at the time of the marriage, and a $9,712.45 balance at the time the complaint for divorce was filed. The trial court noted that Patrick testified that he had opened that account for Ashley's use and there was a zero balance on the account when opened. The trial court therefore ordered that Ashley be responsible for paying the $9,712.45 balance that was on the Discover card account as of the date the divorce action was filed. The trial court further ordered that Ashley's obligation to pay the $9,712.45 Discover card debt be deducted from the $11,620.28 she was awarded from Patrick's personal checking account. Thus, offsetting the $281.02 debt that Ashley was ordered to pay on the Capital One Mastercard #2918 and the $9,712.45 that she was ordered to pay on the Discover card account, the trial court ordered that Ashley's final payout from Patrick's personal checking account be $1,626.91.

{¶34} Finally, the trial court ordered that no spousal support would be awarded to Ashley, and the court denied Ashley's request that Patrick be ordered to pay a portion of her divorce-related attorneys' fees.

*Assignments of Error on Appeal*

{¶35} In this appeal of the trial court's decision, Ashley raises four assignments of error for our review.

**First Assignment of Error**

**The trial court committed reversible error by ordering appellant to pay the full balance on appellee's Discover card at the date of filing, as the undisputed evidence demonstrates that this debt was appellee's sole separate, pre-marital debt obligation acquired before the date of marriage.**

**Second Assignment of Error**

**The trial court committed reversible error by failing to distribute to appellant one-half of the marital bank account and, instead, requiring an automatic off-set for appellant to pay one-half of appellee's pre-marital credit card debt obligation while at the same time allowing appellee to continue to make monthly payments on said debt obligation.**

**Third Assignment of Error**

**The trial court committed reversible error by failing to compensate appellant for her undisputed equity interest in the marital vehicle.**

**Fourth Assignment of Error**

**The trial court committed reversible error by denying spousal support and failing to consider relevant statutory factors.**

*First Assignment of Error*

{¶36} In the first assignment of error, Ashley asserts that the trial court erred in ordering that Ashley be responsible for the $9,712.45 Discover credit card account balance as of the filing date of the divorce. Specifically, Ashley argues that the trial court improperly determined that the debt accrued on the Discover card account was marital debt for which Ashley bears responsibility. In support of that

assertion, Ashley claims that the Discover credit card debt was a gift to her from Patrick and that the debt was incurred by Patrick prior to the marriage.

**{¶37}** A trial court's decision allocating marital property and debt will not be reversed absent an abuse of discretion. *Jackson v. Jackson,* 2008-Ohio-1482, ¶ 15 (3d Dist.), citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131 (1989). An abuse of discretion is more than a mere error; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶38}** "'In determining whether the trial court abused its discretion, a reviewing court should not examine the valuation and division of a particular marital asset or liability in isolation.'" *Siferd v. Siferd*, 2017-Ohio-8624, ¶ 27 (3d Dist.), quoting *Harris v. Harris*, 2004-Ohio-683, ¶ 19 (6th Dist.). "'The reviewing court must, instead, view the property division under the totality of the circumstances to determine whether the property division reflects an unreasonable, arbitrary or unconscionable attitude on the part of the domestic relations court.'" *Id*.

R.C. 3105.171(B) provides:

> In divorce proceedings, the court shall * * * determine what constitutes marital property and what constitutes separate property. In either case, upon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section. For purposes of this section, the court has jurisdiction over all property, excluding the social security benefits of a spouse other than as set forth in division (F)(9) of this section, in which one or both spouses have an interest.

**{¶39}** "Although Ohio's divorce statutes do not specifically articulate debt as an element of marital and separate property, the rules concerning marital assets are usually applied to marital and separate debt as well." *Schwarck v. Schwarck*, 2012-Ohio-3902, ¶ 20 (3d Dist.), citing *Vonderhaar–Ketron v. Ketron*, 2010-Ohio-6593, ¶ 34 (5th Dist.). "The property to be divided in a divorce proceeding includes not only the assets owned by the parties but also any debts incurred by the parties." *Forman v. Forman*, 2014-Ohio-3545, ¶ 31 (3d Dist.), citing *Marrero v. Marrero*, 2002-Ohio-4862, ¶ 43 (9th Dist.).

**{¶40}** A trial court's characterization of property or debt as separate or marital is a mixed question of law and fact, which must be supported by sufficient credible evidence. *Schwarck*, *supra*, at ¶ 19, citing *Kelly v. Kelly*, 111 Ohio App.3d 641, 642 (1996). "The party seeking to establish a debt as separate rather than marital bears the burden of proving this to the trial court by a preponderance of the evidence." *Schwarck*, at ¶ 21, citing *Vergitz v. Vergitz*, 2007-Ohio-1395, ¶ 12 (7th Dist.).

**{¶41}** Finally, we note that evidence that one spouse established certain credit card accounts, or that the accounts were held solely in one spouse's name, does not preclude a finding that the debt incurred on such accounts is marital debt. *See, e.g.*, *Rupert v. Rupert,* 2000 WL 1929874 (3d Dist. Dec. 22, 2000); *Guenther v. Guenther,* 2002-Ohio-376 (12th Dist.).

{¶42} In the instant case, given the trial court's findings, overall analysis, and disposition of the various credit card debts at issue, the trial court appears to have concluded that the Discover credit card debt was either a separate premarital debt of Ashley's or a marital debt for which Ashley also bears responsibility, or possibly both. Either of those determinations is more than adequately supported by the record, particularly the evidence establishing that the Discover credit card account was opened by Patrick for Ashley's use at her request, and the fact that she was primarily responsible for the purchases charged to that card, both prior to and during the marriage.  Moreover, our review of the trial court's overall disposition of the assets and debt at issue in this case reflects that that disposition was equitable under the totality of the circumstances established by the evidence.

{¶43} We also reject Ashley's claim that the evidence proved that Patrick intended the Discover credit card debt, or his payment thereon, to be a gift to Ashley.

{¶44} "The classification of property as a loan or a gift is a factual determination" reviewed under a manifest weight standard of review. *Downing v. Downing,* 2014-Ohio-4725, ¶ 11 (6th Dist.), citing *Johnson v. Johnson,* 1999 WL 760978 (12th Dist. Sept. 27, 1999); and *Bertsch v. Bertsch,* 1997 WL 760951 (9th Dist. Nov. 19, 1997).

{¶45} In this case, Patrick testified that he initially opened the Capital One credit cards and the Discover card in 2022 to help Ashley because she was struggling financially at that time.  He testified that, after she moved in with him, he believed

that assisting Ashley with some of her expenses would help tide her over until she was working again and financially stable. Patrick testified that Ashley specifically requested that he open the Discover card account for her to use during that time, and that Ashley kept promising him that she would go back to work and help contribute financially.

{¶46} Thus, to the extent that the evidence demonstrated a willingness on Patrick's part to pay for some of Ashley's expenses without reimbursement, his testimony also firmly established that his willingness to do so was only intended as a very temporary measure. The evidence presented falls short of establishing that Patrick intended that the debt incurred as a result of Ashley's extensive use of the credit cards, and the Discover card in particular, to be a gift for which she bore no responsibility to repay. Accordingly, the trial court's failure to adopt Ashley's gift theory at trial was not against the manifest weight of the evidence.

{¶47} In summary as to the first assignment of error, after comparing the marital assets and debts assigned to the parties in light of the evidence presented at the divorce hearing, we find no abuse of discretion in the trial court's determination regarding the Discover credit card debt.

{¶48} The first assignment of error is overruled.

*Second Assignment of Error*

{¶49} In the second assignment of error, Ashley asserts that the trial court erred in ordering that Ashley's award of $11,620.28 in funds from Patrick's

personal checking account be reduced, or offset, by the $9,712.45 amount that she was ordered to pay on the Discover credit card debt. Ashley cites to no case law in support of her claim that the court-ordered offset was legally erroneous; rather, Ashley argues merely that the offset ordered by the trial court was "unreasonable".

{¶50} "Trial courts have 'broad discretion to determine what property division is equitable in a divorce proceeding.'" *Collins v. Collins*, 2011-Ohio-2339, ¶ 28 (3d Dist.), quoting *Cherry v. Cherry*, 66 Ohio St.2d 348, paragraph two of the syllabus (1981). Again, an abuse of discretion is more than an error of judgment; it implies that the trial court's decision was unreasonable, arbitrary, or capricious. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶51} Contrary to Ashley's claim here, we find that the offset ordered by the trial court was reasonable. Offsetting Ashley's award from the checking account funds by the amount of her Discover credit card debt obligation was a practical means to effectuate the overall financial settlement ordered by the trial court and ensure that Ashley not shirk her responsibility to pay the credit card debt. That is particularly true given that the record is replete with examples of dishonorable conduct on Ashley's part relating to finances during the pendency of the divorce proceeding.

{¶52} The second assignment of error is overruled.

*Third Assignment of Error*

**{¶53}** In the third assignment of error, Ashley asserts that the trial court erred in failing to compensate her for a portion of the equity in Patrick's Cadillac Escalade. Specifically, Ashley claims that she is entitled to a share of the equity in that vehicle that accrued during the course of the marriage. Ashley argues that Patrick made payments of approximately $700.00 per month on the Escalade while the parties were married and, therefore, she should have been awarded one-half of the total sum paid by Patrick on the Escalade during the marriage.

**{¶54}** The process of fashioning an equitable division of marital property will generally require a trial court to assign or adopt valuations for marital assets. *Gilsdorf v. Gilsdorf*, 2014-Ohio-5000, ¶ 11 (3d Dist.). "The valuation of property in a divorce case is a question of fact." *Schwarck v. Schwarck*, 2012-Ohio-3902, ¶ 27 (3d Dist.). "Accordingly, a trial court's decision pertaining to the valuation of property will be reviewed under a manifest weight of the evidence standard and will not be reversed so long as it is supported by some competent and credible evidence." *Id.* "If the parties to the divorce submit evidence in support of conflicting valuations, the trial court 'may believe all, part, or none of any witness's testimony.'" *Mousa v. Saad*, 2019-Ohio-742, ¶ 14 (3d Dist.), quoting *Huelskamp v. Huelskamp*. 2009-Ohio-6864, ¶ 27 (3d Dist.). Because the trial court is in the best position to evaluate the credibility of witnesses, "[a] reviewing court should be

guided by a presumption that the findings of a trial court are correct[.]" *DeWitt v. DeWitt*, 2003-Ohio-851, ¶ 11 (3d Dist.).

**{¶55}** Finally, we note that "separate property" is defined by R.C. 3105.171(A)(6)(a), and includes any real or personal property, or any interest in such, that was acquired by one spouse prior to the date of the marriage. *Neville v. Neville,* 2009–Ohio–3817, ¶ 11. The commingling of separate property with other property does not necessarily destroy the identity of the separate property, except when the separate property is not traceable. R.C. 3105.171(A)(6)(b). The general rule with regard to separate property is that the trial court must disburse a spouse's separate property to that spouse. R.C. 3105.171(D). Nevertheless, the trial court still has broad discretion in dividing property equitably in a divorce. *Gilleo v. Gilleo*, 2010-Ohio-5191, ¶ 21, citing *Berish v. Berish*, 69 Ohio St.2d 318, 319 (1982).

**{¶56}** In the instant case, the evidence introduced at the hearing established that Patrick owns a Cadillac Escalade, which he purchased in July of 2020. Patrick financed the purchase of the Escalade and, at the time of the divorce hearing, he was still making payments on that vehicle in the amount of approximately $700.00 per month. Patrick testified that he still owed around $14,000.00 on the Escalade and, further, that the Escalade needed about $8,000.00 in repair work, based on an estimate he had received. Ashley contributed no funds toward the payments on the Escalade, during the marriage or otherwise. No specific evidence as to the current value of the Escalade was introduced at the hearing by either party but Patrick

testified that, based on vehicle's current value, he was "upside down" on that vehicle, as he owed more on the vehicle than it was worth.

{¶57} Based on the record before us, Ashley's claim regarding the Escalade lacks merit. The Escalade was purchased by Patrick well before he met Ashley and, therefore, his interest in that vehicle would primarily constitute separate property to which Ashley has no claim, particularly given the extremely short duration of the marriage. More importantly, Ashley's definition of "equity" with regard to the vehicle is erroneous, as the total sum paid by Patrick on the Escalade during the marriage, or even prior thereto, does not necessarily equate to having him having any equity in that vehicle. On the contrary, the evidence at the hearing reflected that Patrick owed more on the Escalade than it was currently worth, meaning he had no equity at all in the vehicle at that time.

{¶58} The third assignment of error is overruled.

*Fourth Assignment of Error*

{¶59} In the fourth assignment of error, Ashley asserts that the trial court erred in failing to order Patrick to pay spousal support.

{¶60} Trial courts have broad discretion concerning an award of spousal support. *Schwieterman v. Schwieterman*, 2020-Ohio-4881, ¶ 69 (3d Dist.). Therefore, a trial court's decision related to spousal support will not be reversed absent an abuse of discretion. *Reed v. Reed*, 2023-Ohio-756, ¶ 33 (3d Dist.).

{¶61} R.C. 3105.18 governs the award of spousal support in divorce cases. "'[S]pousal support' means any payment or payments to be made to a spouse or former spouse, or to a third party for the benefit of a spouse or a former spouse, that is both for sustenance and for support of the spouse or former spouse." R.C. 3105.18(A). "In divorce * * * proceedings, upon the request of either party and after the court determines the division or disbursement of property * * *, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(B). Additionally, "[d]uring the pendency of any divorce * * * the court may award reasonable temporary spousal support to either party." *Id*.

{¶62} R.C. 3105.18(C)(1) contains a list of factors to be considered by a court in determining whether spousal support should be ordered, and provides:

> In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
>
> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

**{¶63}** In the instant case, the trial court's judgment entry of divorce contains the following findings and decision regarding spousal support:

In Defendant's Answer to the Divorce Complaint filed December 8, 2023, Defendant asked for temporary Spousal Support. During the trial, Defendant testified that she wants Spousal Support at least until the end of July 2024 so she can get on her feet and start over, and stated she would like $3,000.00 per month. In closing arguments, Defendant's attorney asked that Plaintiff pay Defendant's expenses

(rent, utilities, medical bills and car lease) through to the end of July
* * *.

The Court in a temporary Order filed-stamped April 26, 2024, and
Nunc Pro Tunc file-stamped April 29, 2024, ordered that Defendant
vacate the marital rental home by May 31, 2024, and that Plaintiff
could take re-possession on June 1, 2024.  It also was ordered that
Plaintiff pay the above named expenses on behalf of Defendant
through to May 31, 2024.  Plaintiff had been paying all of these
expenses in addition to making all of the payments of the credit cards
throughout the pendency of this divorce matter.

Defendant testified that she needed Plaintiff to pay these bills because
she did not work during the marriage.  At various times throughout
her testimony, Defendant gave different reasons as to why she was not
employed:  Plaintiff told her she did not have to work so she could
attend basketball games and events for her son; Plaintiff told her she
did not have to be employed so she could work through her grief of
losing a child; she could not find a job in northwest Ohio; she has a
hormone imbalance; she has anxiety.

However, Defendant also testified that prior to the marriage she had
been making $70,000 at her job in Dayton.  She also testified that she
plans to go into business with a friend and they are looking for a
building in Perrysburg or Sylvania.  She testified that she has her
degree in nursing and was getting ready to take her board testing.
Plaintiff paid the $200 test fee for Defendant in January 2023, but
Defendant said she did not take the test right away.  By postponing
taking the test, she has essentially prolonged her unemployment.  She
testified that she plans to work as a registered nurse once she passes
her testing.

The parties had a very short-term marriage.  They were married May
23, 2023, and Plaintiff filed for divorce six months later on December
5, 2023.  Defendant has paid support from December 5, 2023 to May
2024, a period of 6 months which is almost the length of the duration
of the marriage.  Defendant had good jobs prior to the marriage and is
looking into starting a business, per her testimony, and has a nursing
degree.  The question before the Court is would Defendant have been
working if the parties had not married or Plaintiff had told her she did
not have to work during that period of time in their marriage.  It is

> apparent from the testimony that she only quit her job in Dayton in order to move to northwest Ohio due to her relationship with Plaintiff.
>
> Therefore, the Court awards no further spousal support to Defendant. Plaintiff's monthly payments towards the marital rental property, and towards Defendant's medical bills, car and monthly support terminate as of May 31, 2024.

(8/5/24 Judgment Entry, Docket No. 40).

{¶64} While the trial court did not specifically cite to R.C. 3105.18 in its judgment entry, the court's analysis of the spousal support issue reflects that the court's denial of Ashley's request for spousal support was nevertheless based upon an apparent consideration of the relevant factors set forth in the statute.

{¶65} More importantly, our own review of the record reflects competent, credible evidence supporting the conclusion that Ashley, based on both her education and professional experience, is readily employable, able to support herself, and that she voluntarily opted to be unemployed for the duration of the marriage, including the time period during which the divorce action was pending. The record also establishes that Ashley had previously earned an income more than adequate to provide for her basic needs, and that her earning potential had not materially diminished during the marriage. Finally, the marriage was of extremely brief duration. Those facts, along with the fact that Patrick paid over $18,000.00 to Ashley for spousal support and living expenses during the eight months that the divorce was pending, which was a timeframe longer than the duration of the

marriage itself, lead us to conclude that the trial court did not abuse its discretion in denying Ashley's request for additional spousal support.

**{¶66}** The fourth assignment of error is overruled.

*Conclusion*

**{¶67}** Having found no error prejudicial to the appellant, Ashley Nonnenman, in the particulars assigned and argued, the judgment of the Henry County Court of Common Pleas, Domestic Relations Division, is affirmed.

***Judgment affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

**/jlm**